

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00342-CV

CITY OF FORT WORTH, TEXAS                                    APPELLANT

V.

HARMIT CHATTHA                                                APPELLEE

----------

## FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

Appellant City of Fort Worth appeals the trial court's order denying its plea to the jurisdiction. We reverse and remand.

## II. Factual and Procedural Background

On February 10, 2010, Fort Worth Police Officer Byrd conducted a traffic stop while on duty. Believing the driver to be intoxicated, Officer Byrd called for a

---

[1]*See* Tex. R. App. P. 47.4.

DWI unit to conduct a field sobriety test. While awaiting this unit, Officer Byrd told Lisa Valenzuela, the front seat passenger, to call someone to pick up the car's passengers; she called her brother, Alex Morfin.

According to Officer Byrd, Appellee Harmit Chattha, one of the back seat passengers, refused to leave and insisted that the vehicle be released to him instead of being towed. What happened next is the subject of dispute, and what follows are excerpts from affidavits submitted by Officer Byrd, Chattha, and two witnesses.

According to Officer Byrd,

> Based on Mr. Chattha's behavior in refusing my reasonable requests to move away from traffic, and my observations of him that he had a strong smell of alcoholic beverage on his person, that he had bloodshot eyes, slurred speech, and was swaying, I determined that I had probable cause to believe that Mr. Chattha was intoxicated to the degree that he was a danger to himself and others, and decided to arrest Mr. Chattha for Public Intoxication. I told him he was under arrest. I grabbed him by the left hand and leaned him against the door of the BMW. I took my handcuffs to place them on Mr. Chattha. I was able to place a handcuff on his left wrist. I attempted to grab Mr. Chattha's right arm but he stiffened his arm, thus frustrating the arrest process. I warned Mr. Chattha not to resist. Mr. Chattha then jerked his arm free and was able to turn away from me toward the open driver's door of the BMW. The female who was getting her purse began to scream for me not to arrest him. She climbed through the BMW and came out on the driver's side of the door, therefore Mr. Chattha was now facing her. Both Mr. Chattha and the female were between me and the driver's seat. I could not see Mr. Chattha's right hand, and based on our positions at the vehicle, and his continued resistance to my attempt to handcuff him, I decided to take him to the ground in order to complete the arrest process.

> I determined that the only way I could take Mr. Chattha to the ground safely without throwing him into traffic was to take him down directly behind me. I was still holding on to the handcuff on Mr. Chattha's left arm. I grabbed the back shoulder area of his shirt,

twisted him around and took him to the ground. As he went to the ground, our legs became entangled, and I fell to the ground also. I landed on the lower half of Mr. Chattha's body. I observed that Mr. Chattha went limp as soon as he struck the ground. . . .

I made the decision to take Mr. Chattha to the ground in an effort to gain control of him because he was resisting my attempt to arrest him. I intentionally took Mr. Chattha to the ground. . . .

I believe the force used on Mr. Chattha was necessary and reasonable because he was actively resisting my attempt to arrest him, he was resisting near traffic, he was close enough to a running vehicle to take control of the vehicle in an intoxicated state, and I was outnumbered by his friends on the scene.

According to Chattha,

I was trying to talk to the officer but I was not threatening anyone, staggering, walking into traffic or slurring my words. I don't recall a lot of the details after I was handcuffed but I do remember the officer telling me to turn around, which I did. Then he grabbed my arm to cuff my hand behind my back. I had a car fall from a lift onto my left arm some months prior to this and still suffered from physical injury from that incident. So the range of motion in my arm was not good. I was not struggling or resisting but it was not easy to get my arm behind me because of the injury. That is the last thing that I remember until waking up in the hospital.

According to Alex Morfin, Chattha's brother-in-law and a witness, he went to pick up the passengers after Valenzuela called him. In his affidavit, Morfin stated:

I could not clearly hear everything, but I did hear [Chattha] tell the officer that he could take the car. [Chattha] was not staggering or slurring his words. He was not doing anything dangerous. I next saw Officer Byrd grab [Chattha] and slam him against the car. The officer got one side of the handcuffs on. [Chattha] has an arm injury from a time when a car fell from a jack and landed on his arm. It was a severe injury and his arm did not work normally. I could see that his arm was not bending back easily to put the other cuff on and then the officer grabbed him and swung him around like a rag doll. The officer threw [Chattha] to the ground head first. Since Officer Byrd had [Chattha] at least partially in handcuffs and was holding the

3

cuff, [Chattha] had no way to break his fall and his head slammed into the ground, knocking him unconscious.

According to Valenzuela, Chattha's sister-in-law,

When we were initially pulled over, I called my brother who was nearby and told him that we were being pulled over. My brother and his friend Joe were in a separate vehicle. They were not intoxicated and they arrived at the scene quickly. There was no legitimate reason that one of us could not drive the car home. It seemed as if the officer refused to talk to us about it for no good reason. At that point, [Chattha] said something about calling an attorney. The officer responded by telling [Chattha] to put his hands behind his back and was going to handcuff him. We were very surprised and [Chattha] said[,] "[B]ut I didn't do anything!" The officer responded with[,] "[O]h, yeah!" and slammed [Chattha] onto the car at the driver's side behind the driver's side door. [Chattha] was not swaying or acting drunk. He was not slurring his words and was not staggering into traffic. He was speaking to the officer clearly and walking normally. He wasn't doing anything dangerous. He was just trying to talk to the police officer.

After the officer slammed [Chattha] against the car, the officer was trying to handcuff [Chattha]. [Chattha] had an injury to his arm that affected how far back it would go. [Chattha] did not resist in any way[;] he did not struggle[,] and he did not pull away. [Chattha] did not say anything during this time. But the officer grabbed [Chattha] behind his neck and turned him to the side. The officer then threw his weight onto [Chattha's] back, throwing him to the ground and landing on top of him. I screamed and rushed to [Chattha] and turned him over. There was blood coming out of his ear and his mouth and he was unconscious. I knew he was severely hurt.

Chattha subsequently filed suit against the City for his injuries. The City then filed a plea to the jurisdiction, which the trial court denied, and this appeal followed.

### III. Jurisdiction

The City argues that its plea to the jurisdiction should have been granted under the Texas Tort Claims Act (TTCA) because there was no use of tangible

personal property; the officer's official immunity applied, precluding a waiver of the City's immunity; and the act committed by the officer was an intentional tort.

## A. Standard of Review

A plea to the jurisdiction contests a trial court's subject matter jurisdiction, which is a question of law that we review de novo on appeal. *City of Borger v. Garcia*, 290 S.W.3d 325, 329 (Tex. App.—Amarillo 2009, pet. denied); *see Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 638–39 (Tex. 1999). The plea is used to defeat a cause of action without regard to whether the claims asserted have merit. *Garcia*, 290 S.W.3d at 329 (citing *Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000)). That is, normally the plea "should be decided without delving into the merits of the case." *Blue*, 34 S.W.3d at 554. However, "in some cases, disputed evidence of jurisdictional facts that also implicate the merits of the case may require resolution by the finder of fact." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Hence, in deciding whether the plaintiff has alleged facts affirmatively establishing the trial court's jurisdiction to hear the cause, we may consider the facts alleged by the plaintiff and, to the extent it is relevant to the jurisdictional issue, the evidence submitted by the parties. *Garcia*, 290 S.W.3d at 329; *see also Miranda*, 133 S.W.3d at 226 (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). If the evidence creates a fact question regarding jurisdiction, the trial court must deny the plea and leave its resolution to the fact finder. *Miranda*, 133 S.W.3d at 227–28. But if the evidence is undisputed or fails to raise a fact question on the

5

jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend. *Id.* at 226–27 (citing *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002)).

## B. Analysis

Chatta sued under the TTCA, which provides that "[a] governmental unit in the state is liable for: . . . (2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021 (West 2011).

### 1. Use of Tangible Personal Property

The City argues that "the officer actually used no tools, implements, or other personal property" and that "the facts of the case, as provided in the record, demonstrate that tangible personal property was not used in the incident . . . ." Chatta responds that he was injured by the officer's negligent use of the handcuffs in that the "take down" maneuver used to throw him to the ground was executed while the officer held on to the handcuffs, rendering Chattha unable to use his hands to break the fall.

Under the TTCA, to "use" something is "to put or bring into action or service; to employ for or apply to a given purpose." *Tex. Natural Res.*

6

*Conservation Comm'n v. White*, 46 S.W.3d 864, 869 (Tex. 2001). The evidence presented does not clearly support either position: Morfin's affidavit indicated that the officer "swung [Chattha] around like a rag doll" while holding the cuff as he threw him to the ground, while the officer's affidavit indicated that he "was still holding onto the handcuff on Mr. Chattha's left arm" when he "took him to the ground." This raises a fact question regarding the use of tangible personal property sufficient to defeat this aspect of the City's plea.

The City also asserts that "the positioning of Officer Byrd's hands, if anything, only furnished the condition that made the injury possible," which does not constitute negligent use of property, citing *Dallas County Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex.), *cert. denied*, 525 U.S. 1017 (1998). However, this contention is without merit, because it is the handcuffs, not the officer's hands, which are the personal property at issue. Further, unlike the unlocked door, which allowed a patient to escape and commit suicide in *Bossley*, *see id.* at 341–43, the handcuffs were an integral part of the injury-producing take-down in that either the officer used the handcuffs to throw Chattha to the ground or held the handcuffs while he threw Chattha's body to the ground. We hold that the officer's hands are not personal property and that the handcuffs furnished more than a condition that made the injury possible.

### 2. The Officer's Official Immunity

A government employee is entitled to official immunity from suit if his alleged negligent act occurs during the performance of a discretionary duty that is within the scope of his authority and he acts in good faith. *Telthorster v.*

7

*Tennell*, 92 S.W.3d 457, 461 (Tex. 2002) (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994)). Chattha does not dispute that the City, as the officer's employer, is entitled to derivative immunity if the officer is entitled to official immunity. *See City of Beverly Hills v. Guevara*, 904 S.W.2d 655, 656 (Tex. 1995) (citing *DeWitt v. Harris Cnty.*, 904 S.W.2d 650, 654 (Tex. 1995), for the proposition that a city can rely on the official immunity of its employees and agents). Nor does he dispute that an officer's decisions to make a traffic stop or an arrest are discretionary. *See City of Dallas v. Brooks*, 349 S.W.3d 219, 225 (Tex. App.—Dallas 2011, no pet.) (describing the difference between ministerial and discretionary acts); *Kistner v. Pfannstiel*, 107 S.W.3d 7, 11 (Tex. App.—San Antonio 2002, no pet.) ("[A] law enforcement officer's decision to file a criminal complaint is discretionary because it calls for the officer's 'personal deliberation, decision, and judgment.'"). Therefore, we examine whether Officer Byrd has established that he acted in good faith.

In *Telthorster*, the supreme court set out what is necessary to establish "good faith":

> To establish good faith, Officer Telthorster must show that a reasonably prudent officer, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred. Officer Telthorster need not prove that it would have been unreasonable not to engage in the conduct, or that all reasonably prudent officers would have engaged in the same conduct. Rather, he must prove only that a reasonably prudent officer, under similar circumstances, *might* have reached the same decision. That Officer Telthorster was negligent will not defeat good faith; this test of good faith does not inquire into "what a reasonable person *would have done*," but into "what a reasonable officer *could have believed*."

8

If Telthorster meets this burden, [the complainant], to controvert, must do more than show that a reasonably prudent officer could have reached a different decision. Instead, [the complainant] must offer evidence that no reasonable officer in Telthorster's position could have believed that the facts were such that they justified his conduct. "[I]f officers of reasonable competence could disagree on this issue," the officer acted in good faith as a matter of law.

92 S.W.3d at 465 (citations omitted).

The only evidence before the trial court that could possibly be construed as touching on the "reasonably prudent officer" standard here is the officer's statement, "I believe the force used on Mr. Chattha was necessary and reasonable." We hold that this statement is insufficient to meet the City's burden because, otherwise, any officer could state on any set of facts that he believed his actions were reasonable and be absolved of any responsibility, compelling the grant of any city's plea to the jurisdiction. Nothing in Officer Byrd's affidavit or in the other affidavits before the court provides any standard or benchmark to determine what "a reasonable officer would have believed," and we are not in a position to speculate.[2] We hold that the City has not met its burden to establish that the officer acted in good faith.

### 3. Intentional Torts

The City also asserts that the officer's conduct constituted an intentional tort, which is an exception to the waiver of immunity under the TTCA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.057 (West 2011) (stating that the TTCA's

---

[2]Were we to do so, we would inject our own personal beliefs into this case instead of relying on the evidence presented to the trial court.

waiver does not apply to claims arising out of assault, battery, or any other intentional tort). That is, the City argues that because there was nothing accidental about the officer's conduct in initiating the take-down maneuver to get Chattha to the ground, which caused Chattha's injuries, this exception to the TTCA applies.

We first address what constitutes an assault or battery. "Civil courts look to the Texas Penal Code for the elements of civil causes of action such as assault." *Childers v. A.S.*, 909 S.W.2d 282, 292 (Tex. App.—Fort Worth 1995, no writ). Under the penal code, a person commits an assault if he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly causes physical contact with another when he "knows or should reasonably believe that the other will regard the contact as offensive or provocative." Tex. Penal Code Ann. § 22.01(a)(1), (3) (West 2011). Battery does not require an assault; rather, it requires only an offensive touching, not an intent to injure. *Price v. Short*, 931 S.W.2d 677, 687 (Tex. App.—Dallas 1996, no writ) (citing *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 629 (Tex. 1967)).

"The fundamental difference between negligent injury . . . and intentional injury is the specific intent to inflict injury." *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985); *Presley v. Republic Energy Drilling, L.L.C.*, No. 02-07-00225-CV, 2008 WL 4053002, at *5 (Tex. App.—Fort Worth Aug. 29, 2008, no pet.) (mem. op.) (quoting *Reed Tool*). As to assault or "any other intentional tort,"

10

there is no evidence that Officer Byrd intentionally or knowingly caused bodily injury to Chattha.[3]

Based on the affidavit evidence, however, there is a factual dispute as to whether the officer acted recklessly.[4] The officer's affidavit describes a situation in which a combative, inebriated individual did not comply with the officer's instruction, compelling the officer to take control of the situation by taking the individual to the ground in a safe location behind the vehicle and out of the traffic lane. The other affidavits paint a different picture—that of a sober, non-combative, previously-injured individual who did not need to be taken down at all, much less in the officer's injury-producing manner. These circumstances present a fact question as to whether the officer acted recklessly and, hence, a fact question as to whether the TTCA's exception for assault applies.

However, the evidence shows that the officer intended to touch Chattha and that Chattha would consider it offensive. That is, the officer states in his affidavit that he "intentionally took Mr. Chattha to the ground," and the other three

---

[3]Under the penal code, a person acts "intentionally" when it is his conscious objective or desire to engage in a specific conduct or to cause the result of his conduct. *See* Tex. Penal Code Ann. § 6.03(a) (West 2011). He acts "knowingly" when he is aware of the nature of his conduct or that the circumstances surrounding his conduct exist or when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

[4]A person acts recklessly when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances surrounding his conduct exist or that the result of his conduct will occur, and the risk "must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under the circumstances as viewed from the actor's standpoint." Tex. Penal Code Ann. § 6.03(c).

affidavits indicate that Chattha did not believe that he should be arrested, let alone thrown to the ground, showing that the "touching" would be offensive to him and that the officer should have known the touching would be offensive or provocative to Chattha, constituting a battery. *See* Tex. Penal Code Ann. § 22.01(a)(3). Therefore, because the evidence reflects that a battery occurred, the trial court erred by denying the City's plea on this ground, and we sustain this portion of the City's issue.

## IV. Conclusion

Having sustained part of the City's sole issue based on the TTCA's intentional tort exception, we reverse the trial court's order and remand this cause to the trial court to afford Chattha the opportunity to replead.

PER CURIAM

PANEL: MCCOY, J.; LIVINGSTON, C.J.; and WALKER, J.

DELIVERED: February 16, 2012

12